[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 6, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-15528

_____

D. C. Docket No. 02-00109-CR-J-20-TEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TERRANCE MATTHEWS,
a.k.a. Jack,
a.k.a. Say Jack,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(December 6, 2005)**

ON PETITION FOR REHEARING

Before TJOFLAT and HILL, Circuit Judges, and GRANADE[*], Chief District
Judge.

_____

[*] Honorable Callie V. Granade, Chief United States District Judge for the Southern
District of Alabama sitting by designation.

PER CURIAM:

The United States's Petition for Rehearing is GRANTED.  The opinion

issued on June 8, 2005, in United States v. Matthews, 411 F.3d 1210, is

VACATED, and we substitute the following as the opinion of the court:

Following a jury trial in the United States District Court for the Middle

District of Florida, Terrance Matthews was convicted of one count of conspiracy to

distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 846,

841(a)(1) and two counts of obstruction of justice by intimidation of a witness in

violation of 18 U.S.C. § 1512(b)(1).  The district court sentenced Matthews to 292

months of imprisonment and ten years of supervised release on the conspiracy

count and imposed concurrent sentences of ten years of imprisonment and three

years of supervised release on each of the witness intimidation counts.  On appeal,

Matthews raises four issues:[1] (1) whether wiretap evidence should have been

_____

[1] Matthews belatedly sought to challenge the constitutionality of his sentence in light of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).  Briefing in this case was completed before Blakely was decided, but a little more than four months before oral argument Matthews sought permission to file a supplemental brief challenging the constitutionality of his guideline sentence in light of Blakely.  That motion was denied, as required by circuit precedent.  See, e.g., United States v. Curtis, 380 F.3d 1308 (11th Cir. 2004) (holding that we will not permit supplemental briefs raising Blakely claims that were not advanced in defendants' pre-Blakely initial briefs notwithstanding the fact that such claims were squarely foreclosed by circuit precedent prior to Blakely).  But see United States v. Levy, 391 F.3d 1327, 1345-1347 & nn.15-17 (11th Cir. 2004) (Tjoflat, J., dissenting from the denial of rehearing en banc) (explaining that "this court is truly a minority of one on this issue" and collecting cases).

excluded because the recordings were not sealed in compliance with 18 U.S.C. § 2518(8)(a); (2) whether evidence of a telephone conversation not involving Matthews should have been excluded because it was hearsay, irrelevant, and unfairly prejudicial; (3) whether there is sufficient evidence to sustain the witness intimidation convictions and a related sentencing enhancement; and (4) whether the district court erred by admitting evidence of Matthews's 1991 arrest under Federal Rule of Evidence 404(b).

Part I recounts the course of the proceedings in the district court. In Parts II-V we address Matthews's four claims and find that the district court committed no reversible error. Part VI briefly concludes.

I.

At trial, the Government presented evidence that Matthews was part of a significant, though somewhat informal and irregular, conspiracy to distribute cocaine in Jacksonville and Miami. DEA Agent Frank Orochena testified that the DEA began investigating the conspiracy in July 2000 when Nathaniel King, also known as "Peewee," offered to cooperate with them. Peewee was involved in the conspiracy as a courier. His job was to take cash from Jacksonville to Miami and then return to Jacksonville with cocaine for distribution there. Peewee's employer was Linwood Smith, a major participant in the Jacksonville end of the conspiracy.

In August of 2000, Peewee and an undercover agent bought five kilograms of cocaine in Miami with cash provided by Linwood Smith. On the return trip to Jacksonville, the DEA seized the cocaine in a staged stop. Peewee was allowed to "escape" so that the investigation would not be compromised. The DEA was then able to obtain authorization for wiretaps on Linwood Smith's cell phone and two cell phones owned by Farrell Alston, a major supplier in Miami. Smith's phone was monitored for sixty days. During this time more than 6300 calls were intercepted, 319 of which were deemed "pertinent," i.e., related to the conspiracy. Matthews was not involved or mentioned in any of the pertinent conversations. Alston's phones were monitored for thirty days, and more than 2400 calls were intercepted, 106 of which were deemed pertinent. One of the intercepted conversations was between Matthews and Alston; Alston testified that he and Matthews were discussing the sale of a kilogram of cocaine during the call. Matthews's name was also mentioned briefly in a conversation between Alston and Jason Moore, another member of the conspiracy.

The DEA intercepted the Moore-Alston conversation at 5:21 P.M. on March 20, 2001. Near the end of the short call Moore told Alston that he would call "sa-ous" because he had "the number programmed." Alston testified that "sa-ous" was one of Matthews's nicknames; thus, Moore was going to call Matthews because he

4

had Matthews's phone number programmed on his phone. Moore also told Alston that he would "be on your end 'bout Thursday, Friday" and would "need power pellets." According to Alston, "power pellets" are ecstasy pills. Alston told Moore that he would "get that set up for [him] then."

An hour-and-a-half later, the Government intercepted the Matthews-Alston call. During their conversation, Matthews asked Alston whether "J" (Jason Moore) had called him. Alston said that he had. Matthews then asked whether Alston had "put [Moore] on . . . twenty-six street." Alston testified that "twenty-six street" was a code for the price of a kilogram of cocaine; thus, Matthews was really asking whether Alston had quoted Moore a price of $26,000 for a kilogram of cocaine. Alston replied, "[H]ell no I wouldn't give that to him for that." Matthews said, "Good. Just give it to me then." In other words, according to Alston, Matthews wanted Alston to give him the kilogram so that he could then sell it to Jason Moore.[2] At trial, Alston could not recall whether he actually sold Matthews this

---

[2] The conversation went as follows:
MATTHEWS: "J" call you?
. . . .
ALSTON:         Who this, Jack?
MATTHEWS: Yeah.
ALSTON:         Yeah he had call me.
MATTHEWS: Oh, you told 'em something?
ALSTON:         What, a number?
MATTHEWS: Yeah.
ALSTON:         No, no, he ain't, ah, he ain't, ah he ain't ask me nothing
                'bout that.

particular kilogram of cocaine.

In July and October 2001, the DEA arrested a number of members of the conspiracy. Among them were Farrell Alston, Anthony Wells, Shawn Richardson, James Brown, Antonio Austin, Jason Moore, and Rodney Cannon, all of whom eventually pled guilty and, pursuant to their plea agreements, cooperated with the Government and testified against Matthews.

Farrell Alston was the first of the conspirators to testify at trial. Alston testified to having sold more than 400 kilograms of cocaine during the course of the conspiracy. As part of Alston's plea agreement, the Government filed a §

---

MATTHEWS: Ah, when he ask you a number put him on, ah twenty-six street.
. . . .
ALSTON: Who gone, who gone, who ah, oh who gone do that?
MATTHEWS: Ah, you said on twenty-six street.
ALSTON: Shit, I a hell no wouldn't give that to him for that.
MATTHEWS: Good. Just give it to me then.
ALSTON: Alright. I wouldn't give that to him for that somebody down with me, dawg.
MATTHEWS: So go more than that?
ALSTON: You goddamn right.
MATTHEWS: Where he at, twenty what?
ALSTON: For him?
MATTHEWS: Seven?
ALSTON: No less.
MATTHEWS: Oh okay, yeah, alright then.
ALSTON: Oh where, where you at, L's house?
MATTHEWS: Yeah, L's house.
ALSTON: I'm getting off at the one-o-three right now.
MATTHEWS: Yeah. Come by here.
ALSTON: Alright.

One of Matthews's nicknames is "Say Jack" or "Jack."

5K1.1 motion[3] on his behalf, which led to a five-level sentence reduction for substantial assistance.[4] Alston also received a three-level reduction for acceptance of responsibility. As part of the plea, the Government also declined to pursue any sentencing enhancements based on a firearm found on Alston at the time of his arrest. Alston was sentenced to 135 months in prison for his role in the conspiracy. Without the aforementioned reductions, his applicable guideline range was 324 to 405 months—235 to 293 months even taking into account the reduction for acceptance of responsibility. The Government also filed a Rule 35[5] motion on his behalf that was pending at the time of Matthews's trial; Alston was hopeful that it would result in a further reduction of his sentence.

At trial, Alston testified to the following facts regarding the conspiracy:

---

[3] "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1

[4] Throughout the opinion, we speak of various sentencing reductions, by which we mean reductions from the "base offense level" under the Federal Sentencing Guidelines for the offense to which the defendant pled guilty.

[5] Federal Rule of Criminal Procedure 35(b)(1) provides that "[u]pon the government's motion made within one year of sentencing, the court may reduce a sentence if: (A) the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person; and (B) reducing the sentence accords with the Sentencing Commission's guidelines and policy statements." All of the testifying co-conspirators faced ten-year statutory mandatory minimums. Rule 35(b)(4), however, provides that "[w]hen acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute."

Alston and James Brown were partners in Miami, and Alston was introduced to Matthews through Brown. Alston was responsible for getting cocaine, and Brown had connections with buyers in Jacksonville, including Antonio Austin, Jason Moore, and Linwood Smith. At first, Alston and Brown used Peewee as a courier. Peewee would bring cash to Miami, and they would send twenty to forty kilograms of cocaine at a time back to Jacksonville. After Pewee "escaped" from the staged DEA stop, however, the Jacksonville customers began traveling to Miami to purchase the cocaine in person. Alston's main supplier was George Morales, but he also bought cocaine from Matthews a few times when Morales didn't have all that he needed. Specifically, he purchased cocaine from Matthews—usually five to ten kilograms, but once as much as twenty, at a price of $18,000 to $23,000 per kilogram—"no more than about five or ten times" in 1999 and 2000. He also sold Matthews one to three kilograms of cocaine on about five different occasions in 2000. He and Brown ceased doing business with Matthews, however, after he sold them some bad cocaine sometime in 2000.

After Alston was sentenced and incarcerated in federal prison in Miami, Matthews sent him four letters. The letters used pseudonyms, but Matthews stipulated that he wrote them, and Alston knew that they were from Matthews. The first letter began, "I been hearing some bad things about you old boy and it's

8

coming from some people that seems to know you well." It continued, "[T]he talk is that you have went bad for those folks and you are lying on anyone to get time cut . . . . [T]here is anuff brothers in there for nothing on the count of another brother telling a lie on them." Matthews also urged Alston not to "be another sucker for those folks." Alston understood this to mean that Matthews knew that he was cooperating with the Government and wanted him to stop. The letter also encouraged Alston "to seek the lord and pray and read that bible every day and ask him to show you a way to get closer to him so you could be a better man in christ"; Alston testified that he and Matthews had never discussed religion before.

The letter next stated:

I know you heard about sleep got killed[;] he got shot up in the car one night[;] he died in the hospital a month later[;] thats why I say get your self right with the lord because we don't know when were leaving here but we won't to be right with Jesus.

"Sleep," also known as "Blind," owned a house in Miami where Matthews, Alston, and other members of the conspiracy met to drink, smoke marijuana, shoot dice, and hold dogfights. Alston understood Matthews to be advising him that he should get himself "right" with God because "you don't know when you're going to die." At this point, the Assistant United States Attorney (AUSA) followed up by asking, "And how did you take that? What did you understand that to mean?" Alston explained, "I was taking it, you know, that I'm cooperating with the government,

9

so [Matthews] might have been making threatening gestures." At the end of the letter, Matthews urged Alston not to "be a 'Judus.'"

In the second letter, Matthews again wrote that "sleep got shot up about four times" and urged Alston to keep praying and reading the Bible. He also wrote:

> I know you all ready know the talk on the streets is that you are putting [Matthews] in the mix[.] [W]hats up with that man[?] We all know that [Matthews] didn't have anything to do with you'll other than gambleing and fighting dogs man[.] I don't know but that's crazy too how that kid got indicted on that case with you all. Your son[6] say that you aint saying nothing on no one, but why is it so hard for you to help that man get out of this by just telling the truth to his attorney[?]

Alston understood Matthews to be asking him why he would not tell the Government that Matthews was not part of the cocaine conspiracy, since they both knew that to be the "truth." The letter then stated, "[I]f it was any one of us on the one you know it won't be a problem helping you if they put you in something over there that you had no business with." Matthews apparently meant that the people who hung out at Blind's house ("the one") would all be willing to help Alston if he were ever implicated in a crime he "had no business with."

In the third letter, Matthews wrote,

> [Y]ou don't have your self together with God on believing in Jesus Christ his son because if you did you will be trying to do the right thing and help a brother out . . . [Y]ou say you aint doing nothing to

---

6 Alston's "son" was really a friend of Alston's known as "Tit."

10

no one[,] but I don't need silence from you[.] I need . . . a true friend to help me out because you know it aint . . . like they are trying to put it. . . . I'm asking you for your consideration because you know the truth.

Alston understood this to be yet another request that he tell the Government that Matthews was not involved in the cocaine conspiracy, i.e., the "truth." At the end of the letter, Matthews added, "P.S. Sleep Died too!" and "Say Ough Love You!" "Say Ough" is one of Matthews's nicknames.

In the fourth letter, Matthews wrote, "I know you heard about old boy[;] that junk was mess up." Alston understood this to be yet another reference to Sleep's murder. He then wrote,

[T]hese folks is trying to lock say ough up[.] [W]hat's up with you[?] [A]re you doing what they say you are doing[?] . . . [Say ough] say he been trying to get in touch with you but you won't write back or nothing or talk to his lawyer[.] [H]e say the reason he in this mess is calling your phone and the folk think you'll are talking about something[.] [M]an you know that man didn't have anything to do with you all so way you not going to help that man out of these mess[.] [T]hat man sick[;] he don't know what to do[.] [Y]ou say you not telling nothing on him but you still not trying to help him by telling the truth[.] [H]ow will you feel if you got pick up for something on seven one[⁷] and you know you don't do nothing but gamble round there but the folks say you do something else and no one on seven one is trying to help you[?] . . . [I]t seems like I'm losing everyone I love from niggers lying on them[;] you know that's way sleep got shot up because a nigger step to him and said he was telling the folks on him and they had a fight and that same night he got shot up on the house . . . .

_____

⁷ Blind's/Sleep's house was also known as the "seven one" because it was on 71st Street.

11

Alston interpreted this passage as yet another request that he cease cooperating and tell the Government that Matthews had nothing to do with the conspiracy. He understood the final quoted sentence to mean that Sleep had been killed because someone thought that he was cooperating with the Government.

After Alston finished going through all four letters line-by-line, the AUSA asked him what, in general, he understood the letters to be conveying to him. Alston answered, "Like when he found out that I was cooperating, he made me some threatening gestures."

James Brown testified next. Brown testified that he had sold "hundreds" of kilograms of cocaine during the course of the conspiracy. He pled guilty to conspiring to distribute between fifteen and fifty kilograms. After the Government filed a § 5K1.1 motion on his behalf, Brown received a sentencing reduction for substantial assistance, and he was sentenced to 168 months in prison. Without the § 5K1.1 motion, he was facing 262 to 327 months based on his substantial criminal history. The Government also filed a Rule 35 motion on his behalf that was pending at the time of Matthews's trial; Brown was hopeful that it would result in a further reduction of his sentence.

Brown's general description of his partnership with Alston was consistent with Alston's testimony. According to Brown, he and Alston purchased ten or

more kilograms of cocaine from Matthews "three or four times at the most" in 1998 and 1999. He also bought smaller quantities of cocaine from Matthews on two other occasions. The cocaine involved in the second purchase turned out to be bad; this was the same incident Alston testified to, and Brown also ceased doing business with Matthews thereafter.

The third conspirator to testify was Antonio Austin. Austin was sentenced to 188 months in prison for his role in the conspiracy. The Government filed a Rule 35 motion that was pending at the time of Matthews's trial; Austin was hopeful that it would result in a reduction of his sentence. At trial, Austin testified to the following facts concerning the conspiracy: Austin sold cocaine in Jacksonville at a rate of about two kilograms per week. His primary suppliers were Farrell Alston and James Brown in Miami. Peewee transported the cocaine from Miami to Jacksonville until he was stopped in August 2000; after that, Austin himself would go to Miami to get the cocaine. Austin met Matthews in late 1999 at Sleep's house and first bought cocaine from him—specifically, 1.5 kilograms for a price of $33,000—in December 2000 in a deal facilitated by James Brown. He also bought one kilogram from Matthews in February 2001 for $22,000. He witnessed Matthews deliver three kilograms of cocaine to Jason Moore on another occasion.

13

Jason Moore, one of the primary dealers on the Jacksonville end of the conspiracy, was the fourth member of the conspiracy to testify. Prior to his indictment, Moore became concerned that Shawn Richardson, his "lieutenant," might be cooperating with the Government against him. To convince Richardson that cooperating was a bad idea, Moore had two associates—"Mullet" and "Bubba Ray"—"shoot up" Richardson's house. Richardson, his wife, and his daughter were all shot, but all three recovered. Eventually, Moore cooperated with the Government and pled guilty to distributing between fifteen and fifty kilograms of cocaine. Because of his substantial criminal history, Moore was sentenced to 324 months in prison. The Government filed a Rule 35 motion that was pending at the time of Matthews's trial; Moore was hopeful that it would result in a reduction of his sentence.

At trial, Moore testified to the following facts concerning the conspiracy: He also purchased cocaine from Alston and Brown and used Peewee as a courier until August 2000. He met Matthews in 1998 or 1999, and sometime in 1999 Matthews offered to supply him with cocaine at a lower price than Alston and Brown. He did, in fact, purchase two kilograms or so of cocaine from Matthews at Matthews's house several times in 1999, 2000, and 2001. On one of these occasions, Anthony Wells and Shawn Richardson were with him in Miami, and he

14

tried to transport the cocaine back to Jacksonville by putting it in the trunk of their rental car without telling them; however, Wells and Richardson discovered the cocaine before leaving Miami and refused to drive it back to Jacksonville, so Moore had to drive it back himself.

After Moore was sentenced and incarcerated in federal prison in Miami, he also received a letter from Matthews. Like the letters Alston received, this letter used a pseudonym, but Matthews stipulated that he wrote it, and Moore knew that it was from Matthews. In the letter, Matthews wrote, "I am not trying to call you a rat[,] . . . [but] those white folks are saying that you and a couple of your homeboys are going to comeback on my main man." Moore interpreted this to mean that although Matthews did not want to call Moore a "snitch," the Government (the "white folks") had told him that Moore was, in fact, cooperating against him. The letter also stated, "[S]leep got killed because they say he was working too[;] sleep had a fight with a nigger about that and then the next thing he got shot up in a car with this girl." Moore understood this to mean that Sleep had been killed because he was cooperating with the Government; that is, he understood Matthews to be suggesting that "if you snitch, you going to get killed sooner or later." The letter then asked, "[I]f you would have gotten indicted for something on seven one and you know all you do is gamble around there you will be sick and you will won't to

15

know what's up with those lying nigger wooden you?" In other words, Matthews wanted to know why he had been indicted when all he did at Sleep's house (the "seven one") was gamble. Matthews then reminded Moore that he had always treated him well in Miami. He also told Moore that he had a lot of friends in prison with him and that they had "sent word out about" him, which, according to Moore, meant that they were telling Matthews that Moore was cooperating against him. The letter then urged Moore not to cooperate and to "stay strong and read that bible and start praying." In closing, Matthews warned, "[W]hen that day come we will all see who is doing this to that boy because everyone is saying they are not talking or didn't put this kid in this[;] time will tell and I will be right there to see who really is a Judas."

Rodney Cannon was the fifth conspirator to testify. Cannon pled guilty to distributing one kilogram of powder cocaine and 150 to 500 grams of crack cocaine. After receiving a three-level reduction for acceptance of responsibility and a two-level reduction for his minor role in the offense, Cannon's guideline range was still 120 months (because he was facing a ten-year statutory mandatory minimum) to 135 months in prison. But because the Government then filed a motion on his behalf under 18 U.S.C. § 3553(e), Cannon also received a three-level reduction for substantial assistance, and the court sentenced him to 78 months in

16

prison for his role in the conspiracy.[8]  The Government also filed a Rule 35 motion

that was pending at the time of Matthews's trial; Cannon was hopeful that it would

result in a further reduction of his sentence.

At trial, Cannon testified to the following facts regarding the conspiracy:  He

sold cocaine in Jacksonville at a rate of about four to six kilograms per month.

Jason Moore was his primary supplier.  Moore is also Cannon's brother.  Cannon

was aware that Moore got his cocaine from Miami—at first from Alston and

Brown and, later on, from Matthews—and that Moore either brought it up from

Miami himself or used a courier such as Peewee.  Cannon estimated that he and

Moore purchased a total of about fifty kilograms of cocaine from Matthews in

1999, 2000, and 2001, although Cannon did not meet Matthews until March 2000.

Cannon's trial testimony seems to describe only two specific transactions

involving one to two kilograms of cocaine each.  On both occasions, Matthews

actually delivered the cocaine to Moore outside of Cannon's presence.

Shawn Richardson batted sixth for the conspirators.  Richardson was

---

[8] Because Cannon's substantial assistance reduction put him under an otherwise applicable statutory mandatory minimum, the Government had to file its motion under 18 U.S.C. § 3553(e) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.") rather than simply under U.S.S.G. § 5K1.1.  The same was true with respect to Shawn Richardson and Anthony Wells.  At trial, however, the parties simply referred to the Government's motions as a § 5K1.1 motions.

initially subject to a ten-year mandatory minimum sentence for his role in the conspiracy. The Government then filed a motion on his behalf under 18 U.S.C. § 3553(e), and he received a reduction for substantial assistance. He also received reductions for acceptance of responsibility and his minor role in the offense, and he was sentenced to only 48 months in prison. The Government also filed a Rule 35 motion that was pending at the time of Matthews's trial; Richardson hoped that the motion would lead to an additional sentence reduction.

At trial, Richardson testified to the following facts: He bought cocaine from Jason Moore and Linwood Smith—about four or five ounces a week at a price of $750 to $800 an ounce—and then resold it around Jacksonville. He ceased doing business with Moore, however, after Moore hid two kilograms of cocaine in the trunk of his rental car without his knowledge or permission. On that occasion, Richardson let Moore and Matthews borrow his car. When they brought it back, Moore gave him, Anthony Wells, and a friend of theirs named "Tiger" some gas money for their drive back to Jacksonville. When the three of them stopped for gas, however, they discovered the cocaine in the trunk. Richardson then called Moore and told him that he was not going to drive the cocaine to Jacksonville, so Moore drove the cocaine to Jacksonville himself. Richardson, Wells, and Tiger then returned to Sleep's house and got a flight to Jacksonville the next day. At

18

Sleep's house, Matthews told Richardson that he had told Moore that "there was too many of [them], there was too many to drive it back there like that there, man"; Richardson understood "it" to be the cocaine in the trunk.

Anthony Wells rounded out the Government's seven-conspirator lineup. Wells initially faced a statutory mandatory minimum of ten years in prison. The Government then filed a motion on his behalf under 18 U.S.C. § 3553(e), and he received a reduction for substantial assistance. He also received reductions for his minor role in the offense and acceptance of responsibility, and the court imposed a sentence of only 72 months in prison. The Government also filed a Rule 35 motion that was pending at the time of Matthews's trial; Wells hoped that it would lead to a further reduction in his sentence.

Wells sold cocaine and marijuana in Jacksonville. His suppliers were Linwood Smith and Jason Moore. Wells generally purchased cocaine from Moore on a consignment basis in ounce quantities at prices ranging from $650 to $850 an ounce. Rodney Cannon had told Wells that Moore, in turn, purchased cocaine from James Brown, Farrell Alston, and Terrance Matthews. Wells himself saw Matthews in Miami on two or three different occasions, although he never dealt with him directly. At trial, Wells also testified about the incident in Miami involving the two kilograms of cocaine in the trunk of the rental car. His account

of the incident was, in general, consistent with Richardson's. He testified that after they returned to Sleep's house Matthews told him and Richardson that he had "told Jason it wouldn't work," the "it" apparently being Wells, Richardson, and Tiger driving the cocaine back to Jacksonville.

After the conspirators finished testifying, the Government called two members of the Miami-Dade Police Department who testified about a 1991 incident involving Terrance Matthews. On December 31, 1991, the first officer received a tip that there was a black male selling drugs out of the back of a Chevrolet parked on a specific street corner in Miami. The officer located the car and three times observed Matthews take a small package out of the trunk, hand it to another individual, and take something in exchange for it. After the third exchange, Matthews and the package's recipient were arrested. The package contained cocaine, and Matthews had about $2000 cash on his person. The arresting officers then searched the Chevrolet's trunk and found 251 grams of cocaine, some marijuana, about $1500, and three guns. The drugs were all packaged for street sale. According to the second officer, Matthews was willing to talk and told them that he had "been in the game a while" but was just a "worker," not a "lieutenant." In other words, he had been involved in street-level drug sales for some time but was still near the bottom of the drug-trade hierarchy. His only

20

job was to resupply street-level sellers.

The officers' testimony was admitted under Federal Rule of Evidence 404(b) as evidence of Matthews's "intent." The jury was given the following instruction (or a substantially similar one) three different times:

> You may consider [the Rule 404(b)] evidence not to prove that the defendant did the acts charged in the indictment, but only to prove the defendant's state of mind, that is, that the defendant acted with the necessary intent or willfulness and not through acts of mistake. Therefore, if you find, first, that the government has proved beyond a reasonable doubt that the defendant did, in fact, commit the acts charged in the indictment, and that the defendant also committed similar acts at other times, then you may consider those other similar acts in deciding whether the defendant committed the acts charged here willfully and intentionally and not through an accident or mistake.

**Vol. 13, at 104-05.**

During its closing argument, the Government argued that the 1991 incident did, in fact, help to establish Matthews's "intent":

> The intent in 1991 that the defendant had was to distribute cocaine. He had those little baggies of cocaine in the trunk of his car and he was out there distributing it back in 1991. And by the time of this charged conspiracy in 1999 through June of 2001, the defendant had that same intent. He had the same intent to distribute cocaine, only now he was a bigger dealer. He's dealing in kilograms of cocaine, not little baggies of cocaine any longer.

**Vol. 14, at 22.** In his own closing argument, Matthews's counsel responded that the Government had introduced the Rule 404(b) evidence precisely because it

21

recognized the dubious credibility of the witnesses on which its case rested.  **Id. at 31-32**.  In rebuttal, the Government dismissed defense counsel's suggestion and maintained instead that the evidence was "important" to the issue of "intent":

> [T]he defense wants you to just kind of breeze over this 1991 incident.  The 1991 incident is important.  And it wasn't because the government was stretching and didn't think they had a strong enough case, that's what the defense would like you to think.  That evidence is relevant and it's important for you to consider in determining the defendant's intent to distribute cocaine.  The evidence shows the defendant's intent to distribute cocaine.  That's why that evidence was introduced and that's why it was before you for your consideration.

**Id. at 62-63.**

The jury convicted Matthews on all counts—one count of conspiracy to distribute five or more kilograms of cocaine and two counts of obstruction of justice by intimidation of a witness.

## II.

Matthews first argues that the district court erred in admitting two telephone conversations—one between Jason Moore and Farrell Alston, and one between Matthews and Alston—because the recordings were not sealed in compliance with 18 U.S.C. § 2518(8)(a).  In relevant part, that subsection provides:

> The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations.  <u>Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the</u>

22

judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom . . . .

Id. (emphasis added). The relevant order authorizing the interception of wiretap communications, entered on March 16, 2001, provided that it would terminate "upon attainment of the authorized objectives or, in any event, at the end of thirty . . . days." **Vol. 1, doc. 71, ex. A, p.9.** In its order denying Matthews's motion to suppress the wiretap evidence, the district court concluded that the order actually terminated when interceptions ceased on April 10, 2001, presumably because "authorized objectives" had been achieved at that time. The tapes were sealed two days later. The district court concluded that this two-day delay was "not unwarranted" in light of other business then occupying the court and the time required to package the tapes for sealing. **Vol. 2, doc. 75.**

Three circuits have held that recordings are sealed "[i]mmediately upon the expiration of the period of the order" if they are sealed within one or two days of the expiration. United States v. McGuire, 307 F.3d 1192, 1204 (9th Cir. 2002); United States v. Wilkinson, 53 F.3d 757, 759 (6th Cir. 1995); United States v. Wong, 40 F.3d 1347, 1375 (2d Cir. 1994). We agree with this interpretation. The statute requires the Government to provide a "satisfactory explanation" for failing

23

to seal the recordings "immediately."  See United States v. Ojeda-Rios, 495 U.S. 257, 262-65, 110 S. Ct. 1845, 1849-50, 109 L. Ed. 2d 224 (1990).  If we interpreted "immediately" to mean anything less than one or two days, we would essentially transform the statute into a requirement that the Government seal the recordings before, rather than "immediately upon," the order's expiration.  Indeed, when, as here, an order expires upon the achievement of "authorized objectives" rather than on a fixed date, it is technically impossible to seal the recordings before the expiration of the order; as such, reading "immediately" out of the statute would effectively extend the "satisfactory explanation" to every such case.  Thus, we must give the term "immediately" some meaning.  That being the case, we agree with the Second, Sixth, and Ninth Circuits that "within one or two days" is a reasonable, workable interpretation of that term.  Accordingly, we conclude that the recordings at issue here were sealed "immediately upon expiration of the period of the order" within the meaning of the statute.[9]

## III.

___

[9] In its brief, the Government also argues that the tapes were sealed "before expiration of the thirty-day period described in the authorizing order."  Although it is not framed as such, this argument necessarily challenges the district court's determination that the order actually terminated on April 10 and its implicit finding that the order's "authorized objectives" had been achieved at that point.  We do not address this contention because we conclude that the tapes were sealed "immediately" even if the order terminated on April 10.  For the same reason, we also do not address the Government's argument that it provided a "satisfactory explanation" for the delay even assuming that the tapes were not sealed "immediately."

24

We next address Matthews's arguments that relate to the Alston-Moore conversation specifically. Matthews argues that the conversation is inadmissible hearsay because it was not "during the course and in furtherance of the conspiracy" to distribute cocaine. Fed. R. Evid. 801(d)(2)(E). His theory is that because Moore and Alston discussed an ecstasy sale, the conversation was in furtherance of a different, unrelated conspiracy to distribute ecstasy, of which he was not a member. On the same basis, he claims that the conversation was irrelevant under Federal Rule of Evidence 401. Finally, he argues that because Moore and Alston discussed "power pellets" (ecstasy) the evidence was unfairly prejudicial and should have been excluded under Rule 403. "We review the admission of [evidence under Rule 801(d)(2)(E)] for abuse of discretion, and the court's factual findings that the requirements of rule 801(d)(2)(E) were met under the clearly erroneous standard." United States v. West, 142 F.3d 1408, 1413 (11th Cir.1998), vacated on other grounds, 526 U.S. 1155, 119 S. Ct. 2042, 144 L. Ed. 2d 211 (1999). We also review the district court's application of Rule 401 and Rule 403 under an abuse of discretion standard. United States v. Tinoco, 304 F.3d 1088, 1121 (11th Cir. 2002).

Near the end of the Moore-Alston conversation, Moore tells Alston that he will call Matthews because he has Matthews's number programmed on his phone.

25

An hour-and-a-half later, Matthews called Alston. Matthews first asked Alston whether Moore had called him, and Alston replied that he had. Matthews then asked Alston whether he had told Moore "a number" and, more specifically, whether he had "put [Moore] on . . . twenty-six street." At trial, Alston testified that this was code and that Matthews was really asking whether he had offered to sell Moore a kilogram of cocaine for $26,000. Alston answered, "hell no I wouldn't give that to him for that." Matthews said, "Good. Just give it to me then." Alston agreed.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." "[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence." Bourjaily v. United States, 483 U.S. 171, 176, 107 S. Ct. 2775, 2779, 97 L. Ed. 2d 144 (1987). Matthews argues that the Government did not show that the Moore-Alston conversation was in "the course and in furtherance of [a] conspiracy" in which he was involved. We are not convinced, however, that the district court's finding to the contrary was error, much less clearly erroneous. To recap, Moore told Alston that he would call Matthews. When Matthews called Alston shortly thereafter, he asked Alston

26

whether he had talked to Moore, and Alston said that he had. From the recording and the testimony at trial, it seems that Matthews then asked Alston whether he had quoted Moore a price on a kilogram of cocaine. Moore said that he had not. Matthews then asked whether Alston would sell the kilogram to him instead, and Alston appears to have agreed to do so. In light of all this, it was perfectly reasonable for the district court to conclude that Moore's statement to Alston that he would call Matthews related to the cocaine conspiracy. Matthews is correct that Moore and Alston also discussed ecstasy during the call. He is also correct that he was not charged with distributing ecstasy. But we see no reason to think that the Moore-Alston conversation could not have been "during the course and in furtherance of" two different conspiracies. Accordingly, we reject the argument that it was inadmissible hearsay.

For the same reason, we reject Matthews's claim that the evidence is not "relevant." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Clearly, statements regarding Matthews made "during the course of and in furtherance of the conspiracy" have some tendency to make Matthews's participation in the conspiracy more probable. They tend to show a connection

between Alston, Moore, and Matthews, and, therefore, support trial testimony that Alston and Moore were customers of Matthews and that Matthews was an occasional customer of Alston.

Finally, we reject the argument that this evidence should have been excluded as unfairly prejudicial. Under Federal Rule of Evidence 403, "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Matthews argues that he was unfairly prejudiced by the mention of ecstasy ("power pellets") in the Moore-Alston conversation. Most of the brief conversation, however, did not involve drugs. Only at the very end of the call did Moore tell Alston that he would be in Miami later that week and would "need power pellets"; Alston responded simply that he would "get that set up for [him] then." Given that several of the conspirators testified to substantial personal use of cocaine, marijuana, and ecstasy, any unfair prejudice resulting from this brief exchange could not possibly have "substantially outweighed" the probative value of the conversation. Therefore, the district court did not abuse its discretion by refusing to exclude the conversation on this ground.

IV.

We next address Matthews's claim that there was insufficient evidence to convict him under 18 U.S.C. § 1512(b)(1), which provides in relevant part that

28

"[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, . . . with intent to influence, delay, or prevent the testimony of any person in an official proceeding shall be fined . . . or imprisoned not more than ten years, or both." The indictment charged Matthews with both "intimidation" and "corrupt persuasion"; however, because the jury was instructed as to intimidation only, we will review the sufficiency of the evidence on that theory only. **Vol. 14, at 74-75.**[10]

"We review challenges to the sufficiency of the evidence <u>de novo</u>. In so doing, we view the evidence in the light most favorable to the Government, taking all reasonable inferences and credibility determinations reached in the Government's favor." <u>United States v. Maxwell</u>, 386 F.3d 1042, 1050 (11th Cir. 2004) (citation omitted). "The issue whether a communication is a threat is a question of fact to be left to the jury." <u>United States v. Taylor</u>, 972 F.2d 1247, 1252 (11th Cir. 1992). "If a reasonable recipient, familiar with the context of the communication, would interpret it as a threat, the issue should go to the jury." <u>Martin v. United States</u>, 691 F.2d 1235, 1240 (8th Cir. 1982), <u>quoted</u> in <u>Taylor</u>,

---

[10] Although the court initially instructed the jury that 18 U.S.C. § 1512(b) made it a crime "to use intimidation toward and corruptly persuade with intent to influence, delay and prevent the testimony of a witness," it then further instructed that the defendant could be found guilty "only if [the Government] proved beyond a reasonable doubt . . . that the defendant used or attempted to use intimidation against [Moore and Alston]." The district court never elaborated on the concept of "corrupt persuasion."

29

972 F.2d at 1251.[11]

While the evidence was not overwhelming, a number of statements in Matthews's correspondence to Alston and Moore convince us that it was more than sufficient for a reasonable jury to conclude that Matthews was attempting to intimidate Alston and Moore in order to prevent or influence their testimony. All five of the letters discuss Sleep's murder, and two specifically say that Sleep was killed because he was cooperating with the Government. All of the letters suggest that Matthews knew that the recipient was cooperating against him. Matthews reminded Alston that one can never predict exact time of his death. He also advised Moore that he had a lot of friends in the prison in which Moore was incarcerated. The jury was, of course, free to infer that Matthews was merely passing along news of Sleep's unfortunate demise, reflecting on the fleeting nature of human existence, and sending greetings to acquaintances on the inside. But they certainly were not required to do so. Matthews's sufficiency of the evidence challenge is, therefore, without merit.[12]

---

[11] Taylor and Martin addressed 18 U.S.C. § 876, which prohibits using the mails to make threatening communications.

[12] Matthews also challenges the two-level upward adjustment to his offense level for obstruction of justice. See U.S.S.G. § 3C1.1. Because the Government need only establish the facts necessary to support a sentencing enhancement by a preponderance of the evidence, and we review the district court's findings on sentencing matters for clear error, e.g., United States v. Askew, 193 F.3d 1181, 1183 (11th Cir. 1999), it is clear this claim can fair no better than his challenge to the conviction under 18 U.S.C. § 1512(b)(1).

V.

Finally, we turn to Matthews's claim that the district court erred by admitting Rule 404(b) testimony regarding his 1991 arrest. Federal Rule of Evidence 404(b) provides in relevant part that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

This circuit's test for admissibility of 404(b) evidence was announced in United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc),[13] and later elaborated upon in United States v. Miller, 959 F.2d 1535 (11th Cir. 1992) (en banc):

> First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

United States v. Delgado, 56 F.3d 1357, 1365 (11th Cir. 1995).[14] The district court's decision to admit or exclude such evidence is reviewed for abuse of discretion. Id. at 1363.

---

[13] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[14] Because appellant does not challenge the sufficiency of the evidence supporting the extrinsic act, the second prong of the test need not be considered.

In United States v. Roberts, 619 F.2d 379 (5th Cir. 1980), we applied this framework in the context of a conspiracy charge, stating that "[i]n every conspiracy case, . . . a not guilty plea renders the defendant's intent a material issue. . . . Evidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless [the defendant] 'affirmatively takes[s] the issue of intent out of the case.'" Id. at 383 (last alteration in original) (quoting United States v. Williams, 577 F.2d 188 (2d. Cir. 1978)). Accordingly, Matthews's plea of not guilty, without an accompanying affirmative removal, made his intent a material issue.

The next question is whether the 1991 arrest is relevant to the intent at issue in the current conspiracy charge. In United States v. Butler, 102 F.3d 1191 (11th Cir. 1997), this court held that a three-year-old prior conviction for possession of cocaine for personal use was relevant and admissible for purposes of demonstrating defendant's intent in the charged conspiracy for possession with intent to distribute. Id. at 1195 - 96; see also United States v. Cardenas, 895 F.2d 1338, 1344 (11th Cir. 1990) ("Evidence of prior drug dealings is highly probative of intent to distribute a controlled substance, as well as involvement in a conspiracy." (internal quotation marks omitted) (quoting United States v. Hitsman, 604 F.2d 443, 448 (5th Cir. 1979))). It must follow then that, at least in this circuit,

32

Matthews's 1991 arrest for distribution of cocaine was relevant to the intent at issue in the charged conspiracy to distribute cocaine.

The third prong of the Beechum/Milller test provides that evidence of prior acts is only admissible if its probative value is not substantially outweighed by its prejudicial effect. In this regard, appellant raises several arguments. First, Matthews claims that the prior drug offense is too dissimilar to the charged conspiracy. As noted, circuit precedent regards virtually any prior drug offense as probative of the intent to engage in a drug conspiracy, and we cannot say that the district court abused its discretion in rejecting the contention that the factual dissimilarity here resulted in disproportionate prejudice. Cf. United States v. Delgado, 56 F.3d 1357, 1366 (11th Cir. 1995) (rejecting the argument that the lack of similarity between a large-scale drug conspiracy and a comparatively smaller, one-time drug purchase from an undercover law enforcement officer rendered the evidence substantially more prejudicial than probative).

Matthews also claims that the 1991 arrest was too temporally remote to be probative of intent. In Beechum this court noted that temporal remoteness is an important factor to be considered as it "depreciates the probity of the extrinsic offense." 582 F.2d at 915. This court, however, has refrained from adopting a bright-line rule with respect to temporal proximity because "decisions as to

33

impermissible remoteness are so fact-specific that a generally applicable litmus test

would be of dubious value." United States v. Pollack, 926 F.2d 1044, 1048 (11th

Cir. 1991). Accordingly "appellant bears a heavy burden in demonstrating an

abuse of the court's 'broad discretion in determining if an extrinsic offense is too

remote to be probative.'" Id. at 1047 (quoting United States v. Terebecki, 692 F.2d

1345, 1349 (11th Cir. 1982)); see United States v. Lampley, 68 F.3d 1296, 1300

(11th Cir. 1995) (upholding district court's admission of fifteen-year-old prior

acts). The district court here specifically addressed the temporal remoteness

concern and found that the eight-year period from the 1991 incident to the

beginning of the alleged conspiracy was not too abstracted to be sufficiently

probative. **Vol. 11, at 266 - 67**. We cannot say that appellant met the heavy

burden of demonstrating abuse of discretion here, and we therefore decline to upset

the trial court's considered judgment that the prior offense was proximate enough

to be more probative than prejudicial.[15]

Finally, appellant argues that the 1991 incident was overly prejudicial

because the Government otherwise presented a strong case on the issue of intent.[16]

---

[15] Nor do we find any merit in the claim that Matthews was too young at the time of the 1991 incident for the prior act to be probative of intent. Appellant offers no reason why we should not presume that a twenty-year old can be held accountable for his or her actions.

[16] In Beechum, this court made clear that the stronger the Government's other evidence of intent, the more willing a court should be to exclude extrinsic evidence on intent as overly prejudicial. 582 F.2d at 914 & n.18.

We do not agree that this is so. The jury was entitled to believe as much or as little of the witnesses' testimony as it found credible. Indeed, the jury may have concluded that Matthews engaged in all of the substantive drug offenses about which the witnesses testified without believing that Matthews intended to join a conspiracy. As this court has previously indicated, this precise difficulty of proving intent in conspiracies is what creates the presumption that intent is always at issue:

> Because the prosecution must prove that the defendant knowingly joined a plan to commit a crime, evidence that establishes a defendant's participation in a criminal act, or evidence establishing his association with co-conspirators, may be insufficient to support the inference that the defendant voluntarily joined a conspiracy to commit a crime. . . .
> Unequivocal evidence that a defendant committed a substantive offense may justify the inference that he intended to do so, but it does not plainly support the conclusion that he agreed and planned with others to commit the crime. Evidence of a defendant's association and dealings with a group of conspirators, even when he knows they intend to commit a crime, does not alone show that he himself had the requisite intent to join the conspiracy.

Roberts, 619 F.2d at 383 (citations omitted). As such, the district court was well within its discretion in finding that the Government's need for additional evidence relevant to intent supported its conclusion that the 1991 incident's probative value was not substantially outweighed by undue prejudice.

While this panel may have decided the issue differently, particularly given

35

the lack of similarity and the extended period of time between the offenses, we cannot say that the trial court's decision to admit the evidence constituted such a clear error of judgment as to amount to an abuse of discretion. See United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) ("[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."). Accordingly the district court committed no reversible error in admitting testimony regarding Matthews's 1991 arrest.

VI.

For the foregoing reasons, Matthews's convictions are

AFFIRMED.

TJOFLAT, Circuit Judge, specially concurring:

I concur in the judgment of the panel because I believe it is the correct application of this circuit's precedent. See, e.g., United States v. Machado, 804 F.2d 1537, 1543 (11th Cir. 1986) ("Only a decision by this court sitting en banc or by the United States Supreme Court can overrule a prior panel decision."). I write separately to express my view that the circuit's doctrine with respect to admission of Rule 404(b) evidence in conspiracy cases has evolved into one that undermines Rule 404(b) itself and represents a perversion of the origins of the circuit's doctrine in this context.

The evidence of Matthews's 1991 arrest was admitted for no purpose other than to show propensity to engage in criminal activity: exactly the purpose for which Rule 404(b) prevents evidence to be admitted. Yet, this circuit's doctrine permits such evidence to be admitted as probative of intent. The doctrine presumes that the intent involved in a small-scale drug transaction (not to mention personal drug use, see United States v. Butler, 102 F.3d 1191, 1195 - 96 (11th Cir. 1997)) is somehow probative of one's intention to conspire with others to commit a drug offense. The result is the admission of prior acts, in the name of intent, that would otherwise be inadmissible propensity evidence.[1] Accordingly, if I were writing on

_____

[1] I concede that the line between evidence admitted to demonstrate intent and evidence admitted to demonstrate propensity is hardly clear. It is difficult to argue that a person had an

37

a clean slate, I would hold that the evidence of Matthews's 1991 arrest is irrelevant to the intent at issue and therefore could not be admitted as 404(b) evidence probative of intent.

## I.

As noted in the court's opinion, the starting point for all Rule 404(b) analysis in this circuit is our opinion in United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc).  There we noted:

---

intention to do something on a particular occasion because he or she demonstrated that intention previously without implicitly suggesting that the person has a proclivity towards that intent. Indeed, some contend that a distinction is impossible: "[E]vidence of an unconnected prior crime is always evidence of propensity and never evidence of a specific intent to commit the crime charged.  Though an inference of general intent from the prior crime to the offense charged can be made, such an inference is based upon propensity . . . ."  Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b) and 609(a), 38 Emory L.J. 135, 157 (1989).  Regardless, the rules distinguish between the two and so must we.  In doing so, however, we need to be mindful of the potential for the exception to swallow the rule.  See Thompson v. United States, 546 A.2d 414, 420 - 21 (D.C. 1988) ("[T]he intent exception has the capacity to emasculate the other crimes rule. This is so because, in many cases, it is difficult or impossible to differentiate between the intent to do an act and the predisposition to do it.  For obvious reasons, therefore, courts must be vigilant to ensure that poisonous predisposition evidence is not brought before the jury in more attractive wrapping and under a more enticing sobriquet. . . . If the prime purpose or effect of the introduction of other crimes evidence is to show that the defendant is a bad man (and, in this case, a drug seller), so infelicitous a project cannot be salvaged by characterizing the venture as being designed to prove his intent to sell drugs rather than his predisposition to do so."(citation omitted)).  At the very least, where the evidence sought to be admitted demonstrates nothing more than a criminal intent (or even, more specifically, a prior intention to violate drug laws) it must be excluded as inadmissible propensity evidence.  If the inferential chain must run through the defendant's character – and his or her predisposition towards a criminal intent – the evidence is squarely on the propensity side of the elusive line.  Where, on the other hand, an inference can be drawn that says nothing about the defendant's character – for example, based on the "improbability of coincidence," see Clifford S. Fishman, Jones on Evidence: Civil and Criminal § 17:48 (7th ed. 1992) – the evidence is more appropriately admissible for non-propensity purposes.

What [Rule 404(b)] calls for is essentially a two-step test. First it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403.

Id. at 911.[2] In elaborating on the test, we explained that "[o]nce it is determined that the extrinsic offense *requires the same intent as the charged offense* and that the jury could find that the defendant committed the extrinsic offense, the evidence satisfies the first step under rule 404(b)." Id. at 913 (emphasis added). With respect to the second step, we noted that "[i]f the defendant's intent is not contested, then the incremental probative value of the extrinsic evidence is inconsequential when compared to its prejudice; therefore, in this circumstance the evidence is uniformly excluded." Id. at 914. We stated, however, that "[w]hether a mere plea of not guilty justifies the Government in introducing extrinsic evidence in its case in chief is an open question in this circuit. . . . We need not now answer

---

[2] Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed. R. Evid. 403.

it." Id. at 915.

In United States v. Roberts, 619 F.2d 379 (5th Cir. 1980), the court answered that question in the affirmative in the context of conspiracy cases. Focusing heavily on the uniquely difficult task of proving intent in conspiracy cases, the court concluded that "we cannot apply to them the policy suggested in Beechum of uniformly excluding extrinsic offense evidence when the defendant does not actively contest intent." Id. at 383. "In every conspiracy case, therefore, a not guilty plea renders the defendant's intent a material issue . . . . Evidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless [the defendant] 'affirmatively take[s] the issue of intent out of the case.'" Id. (last alteration in original) (quoting United States v. Williams, 577 F.2d 188 (2d. Cir. 1978)).[3]

_____

[3] While it may be too late in the day to question the wisdom of the Roberts presumption, I do find the resulting Hobson's choice particularly troublesome: The defendant must either stipulate to the intent to conspire (which, in a conspiracy charge, would virtually guarantee a conviction) or have the court presume that the defendant has testified and specifically challenged his or her intent to conspire, which the prosecution is then free to rebut with extrinsic evidence. Moreover, at least one commentator has pointed out the logical fallacy of creating "material issues" due to the difficulty of proving a particular crime:

> Courts have accepted the premise that intent is difficult to prove in conspiracy cases. After all, some of the actions of the conspirators standing on their own may be lawful. Since it is difficult to prove intent, and since the jury might infer from a defendant's lawful actions that he did not intend any illegal activity, evidence of unconnected, though similar, crimes will be admitted. [In other words]: when the government has a weak case, it is "necessary" to "materialize" a nonmaterial issue and prove it with propensity evidence. Nothing in the conspiracy cases logically makes intent "a fact of consequence" other than the "need" to get a conviction. . . . Ultimately, the question of whether intent is a

It is this latter statement that is now reflexively invoked, frequently without reference to context, or any other analysis for that matter, to admit any and all prior acts (involving drugs) in drug conspiracy cases. See, e.g., Butler, 102 F.3d at 1195 - 96 ("Intent is always at issue when a defendant pleads not guilty to a conspiracy charge. . . . [W]e conclude that the logical extension of our current jurisprudence is to admit evidence of prior personal drug use to prove intent in a subsequent prosecution for distribution of narcotics."); Unites States v. Costa, 947 F.2d 919, 925 (11th Cir. 1991); United States v. Pollock, 926 F.2d 1044, 1049 (11th Cir. 1991) (concluding, after citing the Roberts proposition, that "the precedents in this circuit allowing evidence of prior drug-dealing offenses in drug conspiracy prosecutions are ample"). Yet Roberts's progeny has ultimately lost sight of two important components of the Roberts opinion. First, the Roberts contribution to the Beechum test referred only to the second prong of the analysis: once extrinsic evidence has been deemed relevant to intent, Roberts presumes that, in conspiracy cases, the probative value of the prior act is not substantially outweighed by its prejudicial impact even if the defendant did not actively contest the issue of intent. Roberts did nothing to alter the analysis of whether a prior act is relevant to the

---

material issue should be in the hands of the defendant: the nature of the defense should determine whether intent is material.

Ordover, supra note 1, 154 - 55 (footnotes omitted).

41

issue of intent. See Roberts, 619 F.2d at 382 (noting that "[i]f 'the extrinsic offense requires the same intent as the charged offense . . .' then 'the extrinsic offense evidence is relevant to an issue other than the defendant's character,' and satisfies the first requisite of Beechum," before discussing the relevance of a not guilty plea to the second prong of the analysis (citations omitted) (quoting Beechum, 582 F.2d at 913 & 911)); Beechum, 582 F.2d at 914 ("The touchstone of the trial judge's analysis in this context should be whether the Government has proved the extrinsic offense sufficiently to allow the jury to determine that the defendant possessed *the same state of mind* at the time he committed the extrinsic offense as he allegedly possessed when he committed the charged offense.") (emphasis added); United States v. Williford, 764 F.2d 1493,1497 (11th Cir. 1985) ("The first requirement [of a Rule 404(b) analysis] is governed by the general relevance provision of Fed. R. Evid. 401 . . . . [I]f the relevant issue is intent, the acts must require similar states of mind."). Thus, it must first be established that the prior act is probative of intent – that the prior act required the same state of mind as the charged offense – before Roberts comes into play. Roberts simply holds that, in a conspiracy case, absent an affirmative step by the defendant to remove intent from the case, intent is an issue that may be proven through extrinsic acts relevant to that intent.

42

This observation ties into the second overlooked aspect of the Roberts opinion: Roberts deals specifically with *the intent to conspire* to commit an illegal activity.  The more capacious standard for admitting 404(b) evidence in conspiracy cases, announced in Roberts, is fundamentally rooted in the special nature of conspiracy cases.  "Charges of conspiracy involve considerations not present in other criminal prosecutions."  Roberts, 619 F.2d at 382.  As noted in the court's opinion, ante, the Roberts court reasoned:

Because the prosecution must prove that the defendant knowingly joined a plan to commit a crime, evidence that establishes a defendant's participation in a criminal act, or evidence establishing his association with co-conspirators, may be insufficient to support the inference that the defendant voluntarily joined a conspiracy to commit a crime. . . .

Unequivocal evidence that a defendant committed a substantive offense may justify the inference that he intended to do so, but it does not plainly support the conclusion that he agreed and planned with others to commit the crime.  Evidence of a defendant's association and dealings with a group of conspirators, even when he knows they intend to commit a crime, does not alone show that he himself had the

43

requisite intent to join the conspiracy.

Roberts, 619 F.2d at 383 (citations omitted).  In other words, the mental states involved in the substantive drug offenses have very little to do with a defendant's mental state regarding an agreement to conspire.  And it is this later intent, about which it is difficult to draw inferences from underlying substantive offenses, that the Roberts framework addresses.

Given the relative difficulty of establishing conspiratorial intent, the Roberts court created the presumption that such intent is at issue (regardless of whether the defendant actively contests the issue) and evidence of prior acts probative of that intent may therefore be admitted, unless the defendant affirmatively removes the issue of intent from the case.[4]  But if this relaxed standard for admissibility of Rule 404(b) evidence in conspiracy cases is premised on the incongruity between the intent to conspire and the intent to commit the underlying substantive offense, then the probative prior acts must be something more than another substantive offense. If, as Roberts notes, intent to conspire cannot be inferred from proof of the underlying drug offense, it strains credulity to presume that a prior, unrelated drug

---

[4] Even an explicit stipulation as to intent may not be sufficient to bar admission of extrinsic evidence.  See United States v. Williford, 764 F.2d 1493, 1498 (11th Cir. 1985) ("This circuit has refused to adopt a per se rule either for or against admission of evidence when that evidence is relevant to an issue to which the defendant offers to stipulate.").

44

offense might be at all probative of one's current intent to conspire.

This is not to say that evidence of prior substantive offenses is not admissible in conspiracy cases. Before extrinsic acts are admitted, however, it must first be determined what fact(s) they are introduced to prove and whether they are relevant to such fact(s).[5] While prior substantive offenses say very little about one's voluntary participation in a conspiracy, they may be relevant to demonstrate that the defendant had the requisite intent to engage in the criminal object of the conspiracy. See, e.g., United States v. Calderon, 127 F.3d 1314, 1330 (11th Cir. 1997) (defense that defendant "was merely present at the scene of the drug activity" puts intent at issue); United States v. Lampley, 68 F.3d 1296, 1299 (11th Cir. 1994) ("The district court, recognizing that [defendant] was presenting a 'mere presence' defense, stated that the evidence . . . 'shows intent.'"); United States v. Dias-Lizaraza, 981 F.2d 1216, 1225 (11th Cir. 1993) ("[Defendant's] 'non-participation' defense focused squarely on intent. The question in this case . . . was *why* [defendant] was at the shopping center during the transaction."); United States v. Dorsey, 819 F.2d 1055, 1060 (11th Cir. 1987) (defendant claimed he "was merely an 'unwitting' observer . . . and that he had no intent to become involved in any criminal activity"); United

_____

[5] The elements of conspiracy include: (1) the existence of an agreement among two or more persons; (2) knowledge of the general purpose of the agreement; and (3) knowing and voluntary participation in the agreement. United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000).

45

States v. Richardson, 764 F.2d 1514, 1523 (11th Cir. 1985) ("[T]he government had reason at the start of the trial to believe that [defendant] would argue lack of intent because of his reliance on the entrapment defense."). But the intent in these situations is not the difficult-to-prove intent to conspire that prompted the Roberts presumption; it is the intent to engage in a substantive offense. Whether extrinsic evidence can be admitted as proof of intent to pursue the objective of a conspiracy, or an associated substantive offense, is a question analyzed through the Beechum framework, unaffected by the Roberts presumption. Intent to commit a substantive offense does not become more difficult to prove simply because the crime is associated with a conspiracy to commit it. Accordingly, the prosecution cannot benefit from the relaxed standard of admissibility to provide proof of the defendant's intent to commit a substantive offense.

Rather, in order for the Roberts presumption to come into play, it must first be demonstrated that the extrinsic act is probative of the intent to conspire. In Roberts itself, the court noted: "Proof that Mr. Roberts had intentionally joined in a conspiracy to operate a gambling business four years prior to his present participation in such an operation increases the likelihood that he had conspired with others to establish and operate the gambling business." 619 F.2d at 383 - 84. Thus, the Roberts court admitted prior acts demonstrative of an intent to agree with

others to carry out an illegal course of action, even without an affirmative challenge to that intent. See also United States v. Delgado, 56 F.3d 1357, 1365 (11th Cir. 1995) (prior act: conspiracy and attempt to possess with intent to distribute; Pollock, 926 F.2d at 1047 (prior act: conspiracy to import marijuana); United States v. Nahoom, 791 F.2d 841, 843 (11th Cir. 1986) (prior act: participation in unrelated joint money laundering scheme); United States v. Nabors, 707 F.2d 1294, 1300 (11th Cir. 1983) ("[F]our years before the drug smuggling operation charged, [defendant] had been engaged with [co-conspirator] in a series of virtually identical operations."); United States v. Holman, 680 F.2d 1340, 1348 - 50 (11th Cir. 1982) (prior acts: knowledge of and participation with alleged co-conspirators in "nearly identical" smuggling attempts).

The upshot of this framework is that in conspiracy cases extrinsic evidence can be admitted for either of two intent-related purposes. First it can be admitted to show the defendant intended to engage in the underlying offense (e.g., he intended to distribute or possess an illegal drug). On this, Roberts has no bearing. Second, prior acts may also be introduced as evidence of a defendant's intent to conspire to commit an illegal activity. For this purpose, Roberts provides the presumption that intent is a material issue unless the defendant affirmatively removes it from dispute. Yet in these contexts, the extrinsic acts must at least be more relevant to the intent

to conspire than the substantive acts of the charged conspiracy, the irrelevancy of which led to the <u>Roberts</u> presumption in the first place.

Our precedent, however, has evolved into a doctrine foreign to the analytical underpinnings of the <u>Roberts</u> opinion, and antithetical to the purposes of Rule 404(b). We have approved of the admission of prior substantive offenses for the purpose of establishing an intention to accomplish the object of the conspiracy simply because the defendant pled not guilty. <u>See, e.g.</u>, <u>Costa</u>, 947 F.2d at 925. In <u>United States v. Maxwell</u>, we admitted extrinsic evidence "as relevant to [defendant's] intent to distribute controlled substances," where defendant "placed [intent] at issue by pleading not guilty to the charge against him." 34 F.3d 1006, 1009 (11th Cir. 1994). And in <u>Butler</u>, we admitted evidence of a prior conviction for *possession* of cocaine, "to establish the intent to conspire to distribute narcotics," after reciting the familiar refrain that "[i]ntent is always at issue when a defendant pleads not guilty to a conspiracy charge." 102 F.3d at 1195. <u>Compare</u> <u>United States v. Zelinka</u>, 862 F.2d 92, 99 (6th Cir. 1988) ("The district court abused its discretion by admitting the evidence in question without requiring the prosecutor to show its relevance and the necessity for its admission. Even if the evidence indicated that [defendant] possessed cocaine for the purpose of distribution . . ., it was not admissible to prove that he had participated in a conspiracy to distribute

48

cocaine . . . ." (citation omitted)). In other words, due to the <u>Roberts</u> doctrine, unless a defendant affirmatively removes intent from issue, all prior drug offenses, whether probative of the intent to conspire or not, are admissible so long as a conspiracy has been charged and Rule 403 balancing is satisfied.

As a result, the <u>Roberts</u> presumption has morphed into a categorical-relevancy doctrine that presumes that virtually all prior drug offenses are relevant and almost automatically admissible in all drug conspiracy cases (subject only to Rule 403).[6] This is true regardless of the theory of defense or whether the prior offense involved the same state of mind that is at issue (either by default or affirmatively) in the charged conspiracy. This fuzzy math is not only problematic from a theoretical perspective,[7] but it serves to admit propensity evidence in the

---

[6] We have sensibly limited admission of prior acts to those that at least arguably deal with the same underlying substantive offense of the conspiracy (e.g., prior drug offenses in drug conspiracy cases). See <u>United States v. Young</u>, 39 F.3d 1561, 1573 (11th Cir. 1994) ("Alcohol is not a controlled substance, and the illegality of its production is distinct in both fact and law from that involved in growing and selling marijuana. Evidence that the [defendants] made alcohol thus was not probative of their intent to engage in a conspiracy to possess and distribute marijuana, and any inference that could be drawn from the introduction of this evidence was precisely that which Rule 404(b) was designed to prohibit.").

[7] Relevance is inherently a case-specific determination, <u>see</u> Fed. R. Evid. 401 advisory committee's note ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case."), and this court should not be so bold as to announce a one-size-fits-all rule in a context where one size cannot fit all.

name of intent.[8]  The intent necessary to possess an illegal drug is no more relevant

to the intent to either conspire to distribute illegal drugs or to distribute them than

any other criminal act.  Cf. United States v. Baldarrama, 566 F.2d 560, 568 (5th Cir.

1978) ("However, there is no real danger of impropriety here, since the prior

conviction did not involve a conspiracy, and therefore could not properly have been

used by the jury to indicate an intent to conspire.").  Its only relevance is sheer

propensity: the theory being that the defendant acted illegally then, and is likely to

be acting illegally now.  This is precisely the inference the law does not allow.  Cf.

People v. Zackowitz, 172 N.E. 466, 468 (N.Y. 1930) (Cardozo, C.J.) ("If a

murderous propensity may be proved against a defendant as one of the tokens of his

guilt, a rule of criminal evidence, long believed to be of fundamental importance for

the protection of the innocent, must be first declared away.").

Thus, this circuit's doctrine has turned Rule 404(b) on its head, in so far as

conspiracy cases are concerned.  The second sentence of Rule 404(b)[9] is an

---

[8] As Judge Torreulla has astutely noted, "[a]t times . . . a court circumvents the ban [on the use of propensity evidence] by allowing other crimes into evidence whenever intent or knowledge are arguably at issue, without making explicit the specific logical progression that makes either intent or knowledge more likely in light of the prior crime." United States v. Rubio-Estrada, 857 F.2d 845, 853 (1st Cir. 1988) (Torruella, J., dissenting).  This observation rings particularly true with respect to this circuit's conspiracy case law.

[9] "[Evidence of other crimes, wrongs or acts] may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."  Fed. R. Evid. 404(b).

exception to the general rule that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). There is nothing in the Rule or in logic that would treat conspiracies differently in this regard. Yet we have bypassed the strictures of Rule 404(b) by presumptively assuming that intent is always an issue in conspiracy cases and that all prior substantively-related acts are relevant to that intent. This is nothing more than propensity by any other name.

## II.

The case at bar squarely demonstrates the problems created by our precedents. The Government rightly states, that "Matthews's not-guilty plea placed directly at issue his intent to join the charged conspiracy to distribute cocaine." It then seeks admission of Matthews's 1991 arrest for trafficking cocaine as evidence of his intent to engage in the alleged conspiracy. Neither Beechum, Roberts, nor a straightforward relevance analysis would permit the evidence to be admitted.

There is no question in this case that if the jury were to believe the alleged co-conspirators' testimony, it must believe that Matthews intended to possess and deliver cocaine. Moreover, Matthews did not put his intent to distribute at issue merely by pleading not guilty. He did not contend that he engaged in the alleged activities but did not know he was distributing cocaine. He did not contend that he

51

was merely present at the alleged transactions. Rather, Matthews claimed that the witnesses were not telling the truth at all. See Brief of Appellant at 19. The open issue, per Roberts, is whether Matthews had the requisite state of mind to be convicted of a conspiracy to possess and deliver cocaine, viz. whether Matthews voluntarily joined an agreement to engage in such activity. On this issue, the 1991 incident sheds no light. To the extent the prior arrest was at all relevant it was to show that Matthews was dealing drugs 1991 and was still dealing drugs in 1999, 2000, and 2001, which somehow makes it more likely that he was also *conspiring* to deal drugs during that time.[10] In other words, Matthews was bad in 1991 and he's bad now. Propensity does not become intent simply because the Government says as much.

It is clear to me that this evidence should not have been admitted in this case. Yet our precedent makes it impossible for me to so hold. As indicated in Part I, cases such as Costa and Butler have expanded the Roberts doctrine beyond

---

[10] As noted above, in its closing argument, the Government argued that

[t]he intent in 1991 that the defendant had was to distribute cocaine. He had those little baggies of cocaine in the trunk of his car and he was out there distributing it back in 1991. And by the time of this charged conspiracy in 1999 through June of 2001, the defendant had that same intent. He had the same intent to distribute cocaine, only now he was a bigger dealer. He's dealing in kilograms of cocaine, not little baggies of cocaine any longer.

**Vol. 14, at 22.** Matthews, however, was not being charged with distribution of cocaine, nor was his intent to further the conspiracy by distributing cocaine put at issue by his not guilty plea.

anything that resembles the original framework.[11]  In this circuit, in any conspiracy case where the defendant has pleaded not guilty and has not stipulated to intent, any prior act that has anything to do with the object of the conspiracy is deemed probative of the intent to engage in the conspiracy.  In this case, Matthews was charged with conspiracy to distribute five or more kilograms of cocaine.  He pled not guilty and did not stipulate to intent.  He was previously arrested for a crime involving drugs.  In this circuit, the prior incident is unequivocally admissible subject only to Rule 403 balancing.  I strongly encourage the court to revisit the doctrine leading to this result.

---

[11]  Under the prior panel rule, this panel would be obliged to disregard any panel decisions that are expressly or implicitly inconsistent with earlier circuit precedent such as Beechum or Roberts.  See Swann v. Southern Health Partners, Inc., 388 F.3d 834, 837 (11th Cir. 2004) ("Under the prior panel rule, we are bound by the holdings of earlier panels unless and until they are clearly overruled en banc or by the Supreme Court.").  I do not believe, however, that the post-Roberts case law can be interpreted as overturning Roberts, or is irreconcilable with prior 404(b) doctrine.  Rather, I simply believe that Roberts's progeny has, over time, come untethered from the reasoning of the Roberts court and has resulted in an unprincipled and unwieldy doctrine that ought to be tamed.  Accordingly, I view this panel as bound by Roberts's progeny and implore the circuit to rethink the direction the doctrine has taken.