[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12116
Non-Argument Calendar

_____

D.C. Docket No. 4:17-cr-00048-MW-CAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMILA TAKIYAH HUNTER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(December 21, 2018)

Before WILLIAM PRYOR, HULL and JULIE CARNES, Circuit Judges.

PER CURIAM:

After a jury trial, Jamila Hunter appeals her conviction for possession with intent to distribute alpha-Pyrrolidinopentiophenone ("alpha-PVP"). On appeal, Hunter argues that the district court abused its discretion in admitting evidence of Hunter's post-arrest possession, use, and distribution of alpha-PVP and recordings of Hunter's jail phone calls about past drug activities. After review, we affirm.

## I.  BACKGROUND FACTS

### A.  Alpha-PVP Importation Scheme

The trial evidence showed that Hunter became involved in a scheme to import alpha-PVP from China for distribution in Florida. The ringleader, Travis Glasco, purchased the alpha-PVP on the "dark web" using the crypto-currency Bitcoin, recruited others to rent mailboxes in Tallahassee, Florida and other nearby cities, and then had the packages of alpha-PVP shipped to those mailboxes. The renters provided their mailbox keys to Glasco so that he and others could retrieve the packages. To protect the importation scheme's participants, the packages were sent to a name similar, but not identical, to the mailbox renter's name. Then the person picking up the package would write "return to sender" on it so that the person could deny any knowledge of the scheme if he or she was caught with the package.

After successfully receiving a package, Glasco had others sell the alpha-PVP for him. In 2016, Glasco successfully purchased 20 one-kilogram packages for

2

$4,000 to $5,000 each, then sold each kilogram of alpha-PVP for approximately $100,000, and made almost $2,000,000 in total.

Two of Glasco's distributors were Tyrail Gallman and Charik James, both of whom knew Defendant Hunter. Gallman was Defendant Hunter's drug supplier and recruited Hunter to rent a mailbox for the importation scheme. On August 31, 2016, Defendant Hunter opened a mailbox in her name at a UPS Store in Tallahassee, Florida. Hunter was paid with drugs for the use of her mailbox. After Gallman brought Glasco the key, Glasco had packages sent to Defendant Hunter's mailbox.

On September 30, 2016, Glasco picked up the first package of drugs from Hunter's mailbox himself. At Gallman's request, Glasco also took a food stamp card sent to Defendant Hunter at the mailbox address. Gallman planned to hold the food stamp card as collateral because Defendant Hunter owed him money. In response, Hunter instructed employees at the UPS Store that no one else was permitted to open her mailbox. Consequently, Glasco could not pick up future packages sent to Defendant Hunter's mailbox.

James, another of Glasco's distributors, lived in the same motel as Defendant Hunter, and the two had daily interactions involving drugs. Hunter told James that Gallman was her drug supplier, that she and Gallman had picked up packages before, and that she knew when a package was coming to her mailbox

3

because she received an email notifying her that a package had arrived. James said Hunter initially believed the packages coming to her mailbox were for Gallman. After Defendant Hunter learned that the packages actually belonged to Glasco, she wanted to get closer to Glasco and tried to get his phone number. Glasco, however, did not like Hunter and told James not to give his phone number to her. When Hunter texted James repeatedly, Glasco told James to stop dealing with her.

On October 22, 2016, a second package from China arrived in Defendant Hunter's mailbox. On October 24, 2016, Glasco picked up Hunter and James at their motel and took them with him to pick the package up. Defendant Hunter went into the UPS store and brought the package out. Afterward, they returned to the motel, where Glasco gave portions of the alpha-PVP to James and Defendant Hunter.

Later, James learned that Defendant Hunter planned to pick up Glasco's next package and keep the drugs for herself. James told Glasco about Hunter's plan, and Glasco said this third package did not contain drugs. James warned Hunter not to pick up the package and advised her it did not contain drugs, but Hunter picked the third package up anyway. When Defendant Hunter opened the package and found a cell phone jammer, she brought the opened package to James, who took it to Glasco.

4

On November 8, 2016, the final package from China, addressed to "Jamal Hunter," was delivered to Hunter's mailbox. Unbeknownst to Glasco and the other participants in his scheme, Customs and Border Protection officials had intercepted the package, which tested positive for alpha-PVP. Agents set up a controlled delivery and waited for the pick up.

Glasco drove Defendant Hunter and James to the UPS store. In the parking lot, Glasco gave Hunter and James some alpha-PVP, which they used in the car. While Glasco waited in his car, James and Hunter entered a nearby sporting goods store and purchased some shoes for Hunter's daughter. James returned to Glasco's car, and Hunter went into the UPS Store to retrieve the package. Once Defendant Hunter left the UPS Store with the package, agents intervened, seized the package, and arrested her. James was also arrested, but Glasco fled and was not apprehended until February 2017.

## B.    Indictment and Not Guilty Plea

A grand jury charged (1) Glasco and others, including Defendant Hunter, James, and Gallman, with conspiracy to possess with intent to distribute alpha-PVP between August 31, 2016 and February 2, 2017, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 (Count One); and (2) Glasco, James, and Defendant Hunter with possession with intent to distribute alpha-PVP on November 8, 2016, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C.

5

§ 2 (Count Two).  Although her codefendants pled guilty, Hunter proceeded to trial.

## C.　Pretrial Ruling on Rule 404(b) Evidence

At a pretrial hearing, the district court ruled on the parties' cross-motions in limine.  Relevant to this appeal, the district court ruled admissible under Federal Rule of Evidence 404(b) the government's evidence of Hunter's post-arrest drug activity, including: (1) two positive drug tests for alpha-PVP; and (2) testimony from Victoria Burris, a cooperating witness, that Hunter had sold and shared with her alpha-PVP.  The district court concluded that recordings of some of Hunter's post-arrest jail phone conversations, in which she seemed to refer to her past experiences transporting and using drugs, also were admissible under Rule 404(b).

## D.　Trial and Conviction

At Defendant Hunter's two-day trial, Glasco and James testified as cooperating witnesses and, along with Special Agent Michael Harvill, outlined the events described above.  In addition, the government presented evidence of Hunter's post-arrest drug tests in November and December 2017, both of which were positive for alpha-PVP, and Victoria Burris's testimony that on four or five occasions between March and November 2017 Defendant Hunter sold and gave her small quantities of alpha-PVP from Hunter's "personal stash."  First after Burris's testimony and again after the drug test evidence, the district court gave the

jury limiting instructions advising them that the similar acts evidence could not be considered to decide if Hunter committed the acts charged in the indictment, but could be considered to decide whether Hunter "had the state of mind or intent necessary to commit the crime charged . . . and whether [Hunter] committed the acts charged . . . by accident or mistake."

The government also published to the jury recordings of several of Hunter's post-arrest jail phone calls, with corresponding transcripts.[1]  Because Hunter contested the accuracy of one of the government's transcripts, the district court allowed her to submit a competing transcript.

Relevant to this appeal, in one recording, Hunter discussed getting "something to smoke" with a man she and the other speaker call "Dirt."  Hunter said that she "took [Dirt] to go do something he had to do," and after being asked several times to clarify what Dirt had to do, Hunter declined to answer and reminded the person on the phone that she was speaking to him on a jail telephone.

Before the other relevant recording was published, the district court permitted Hunter to point out the disputed terms in government's transcript and explain her position as to their meaning.  Hunter stated that, rather than the government's version, "going with Chill," which was Gallman's nickname, she actually said, "going to chill."  The government then played the recording, in

---

[1]The district court permitted the government to publish two other jail phone call recordings that Hunter does not challenge on appeal.

which Hunter explained why she had not wanted to risk traveling from Florida to Texas on a previous occasion with her baby and being stopped and put "in jail out of state." Hunter stated that "it's almost impossible to go through Florida through Louisiana through Texas and come back and not get pulled over by . . . the DEA . . . when they see Florida tags coming all through them States with all them drugs." Hunter went on to explain that she preferred to travel at night because she was less likely to be pulled over. According to the government's transcript, Hunter then stated, "I've been doing this shit since 2005. Actually actually doing doing it. And actually just going with Chill." Hunter added, "I know what to do and what you can get away with."

Defendant Hunter's defense was that she was an unwitting participant in Glasco's drug conspiracy and that the testimony of Glasco and James implicating her was not credible. Defendant Hunter testified that she opened the UPS Store mailbox as a favor to Gallman because he did not have the necessary identification to open one for himself. After a couple of months, however, Hunter decided to use the mailbox to receive food stamp and child support cards because she could not receive mail at her motel.

Defendant Hunter admitted picking up three of Gallman's packages but claimed she was never aware they contained drugs. When James's girlfriend suggested to Defendant Hunter that Gallman and James were shipping drugs to the

8

mailbox, Hunter opened the first package, but found only electronic equipment. As for the second package, when Defendant Hunter saw that it was addressed to "Jamal Hunter," she wrote "return to sender" on it and gave it unopened to James's girlfriend to drop in a mailbox. Defendant Hunter denied telling the UPS Store that she was the only person who could pick up packages. Defendant Hunter also denied knowing Glasco, trying to get his phone number, getting some alpha-PVP from Glasco after picking up one of his drug packages, or trying to steal drug packages from him.

According to Defendant Hunter, she met Glasco for the first time on the day of her arrest. Glasco picked Defendant Hunter up to take her to James and then drove them to the store so Hunter could buy shoes for her daughter. Because the UPS Store was next door, Defendant Hunter decided to check her mailbox for a child support card she was expecting. When she went inside, a UPS Store employee handed Defendant Hunter a package. Hunter admitted that she occasionally used alpha-PVP, and that after her arrest, she had smoked some alpha-PVP with Burris, but Hunter denied selling Burris drugs.

Hunter also offered innocent explanations for her recorded jail phone calls, and she maintained that the excerpts of her conversations were taken out of context and misleading. In particular, Hunter explained that the first challenged phone call was with her boyfriend, who was "being jealous and nosey" about her riding in a

9

car with another man and she refused to explain what "Dirt" had to go do because she was "blowing [her boyfriend] off."

As for the other phone call, Hunter said she had family in Texas that she often visited, and she was explaining to her boyfriend, who had never travelled outside of Tallahassee, that she likely would have been pulled over with Florida tags and could have been arrested because she had a warrant at the time. Hunter maintained that when she said, "I've been doing this shit since 2005," she was referring merely to travelling between Florida and Texas.

After deliberating for over three hours, the jury indicated that it was unable to reach a unanimous verdict on either count. The district court issued a modified Allen charge. An hour later, the jury returned a unanimous verdict acquitting Hunter of the conspiracy charge in Count One but finding her guilty of the possession with intent to distribute charge in Count Two. The district court later imposed a 72-month sentence.[2]

## II. DISCUSSION

### A. Standard of Review

We review a district court's evidentiary rulings for abuse of discretion. United States v. Matthews, 431 F.3d 1296, 1311 (11th Cir. 2005). A district court abuses its discretion when it "applies the wrong law, follows the wrong procedure,

---

[2]Hunter does not appeal her sentence.

10

bases its decision on clearly erroneous facts, or commits a clear error in judgment." United States v. Brown, 415 F.3d 1257, 1266 (11th Cir. 2005).  Further, we will not reverse an erroneous evidentiary ruling if the error was harmless.  United States v. Langford, 647 F.3d 1309, 1323 (11th Cir. 2011).  An error is harmless if "sufficient evidence uninfected by any error supports the verdict, and the evidence did not have a substantial influence on the outcome."  Id. (quotation marks omitted).  Evidence admitted in violation of Rule 404(b) is considered harmless if there is other substantial evidence of the defendant's guilt.  See United States v. Chavez, 204 F.3d 1305, 1317 (11th Cir. 2000).

**B.    Rule 404(b) Three-Part Test for Admissibility**

Rule 404(b) forbids the admission of evidence of "a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1). However, the same evidence "may be admissible for another purpose, such as to proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  This Court has previously observed that "Rule 404(b) is a rule of inclusion" and relevant Rule 404(b) evidence "like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case."  United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003) (internal quotation marks omitted).

11

To be admissible under Rule 404(b), the evidence must (1) be relevant to an issue other than the defendant's character; (2) be sufficiently proven to allow a jury to find that the defendant committed the extrinsic act; and (3) possess probative value that is not substantially outweighed by its risk of undue prejudice under Federal Rule of Evidence 403.  Matthews, 431 F.3d at 1310-11.

As to the first prong, a defendant who pleads not guilty to a drug trafficking offense makes intent a material issue that imposes a substantial burden on the government, which it may prove using qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue.  United States v. Zapata, 139 F.3d 1355, 1357-58 (11th Cir. 1998); see also United States v. Delgado, 56 F.3d 1357, 1365 (11th Cir. 1995).  "[C]ircuit precedent regards virtually any prior drug offense as probative of the intent to engage in a drug conspiracy . . . ."  Matthews, 431 F.3d at 1311; see also United States v. Butler, 102 F.3d 1191, 1195-96 (11th Cir. 1997) ("[T]he logical extension of our current jurisprudence is to admit evidence of prior personal drug use to prove intent in a subsequent prosecution for distribution of narcotics.").

With respect to the second prong, there is sufficient proof of the defendant's other act if a jury could find by a preponderance of the evidence that the defendant committed the act.  United States v. Eduoard, 485 F.3d 1324, 1344 (11th Cir. 2007).  A defendant's "own statement, admitting that he committed the act, even if

12

mere puffery, is sufficient to justify a jury finding that he committed the act." United States v. Chilcote, 724 F.2d 1498, 1502 n.2 (11th Cir. 1984); United States v. Edwards, 696 F.2d 1277, 1280 (11th Cir. 1983).

Under the third prong, to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, the district court considers all the circumstances of the extrinsic act, including "whether it appeared at the commencement of the trial that the defendant would contest the issue of intent, the overall similarity of the charged and extrinsic offenses, and temporal proximity between the charged and extrinsic offenses." Edouard, 485 F.3d at 1345. When the Rule 404(b) evidence goes to intent, rather than identity, less similarity between the charged and extrinsic acts is required, and a similarity in the overall purpose is enough. Delgado, 56 F.3d at 1366.

## C.    Evidence of Hunter's Post-Arrest Drug Use and Drug Sales

The district court did not abuse its discretion in admitting evidence of Hunter's post-arrest use and distribution of small quantities of alpha-PVP. As to the first prong, by pleading not guilty, Hunter put her intent at issue as to both charges. The selling of alpha-PVP to Burris and the charged offenses of conspiring to possess, and possessing, alpha-PVP with the intent to distribute involve the same state of mind. See Edouard, 485 F.3d at 1345. While Hunter's personal drug use did not require the same state of mind, this Court has held that

13

evidence of personal drug use outside the period of the alleged conspiracy is probative of intent to distribute or conspire to distribute drugs.  See Matthews, 431 F.3d 1311; Butler, 102 F.3d at 1195.[3]

As to the second prong, the positive drug tests, Hunter's admission that she used alpha-PVP and Burris's testimony that Hunter both shared and sold her alpha-PVP were sufficient to allow the jury to find by a preponderance of the evidence that these acts occurred.  See United States v. Barrington, 648 F.3d 1178, 1187 (11th Cir. 2011).

Turning to the third prong, the probative value of Hunter's personal use and her sales to Burris of small quantities of alpha-PVP is not substantially outweighed by the risk of unfair prejudice.  Hunter put up a "non-participant" defense, testifying that she was duped by James and Gallman and never knew that they were shipping alpha-PVP to her UPS Store mailbox.  To refute Hunter and show that she knew all along that the packages contained alpha-PVP, the government relied primarily on the testimony of Glasco and James.  Both witnesses had prior criminal histories and were key players in the drug importation scheme who faced stiff sentences.  Both admitted testifying against Hunter in hopes of receiving

---

[3]Although Hunter criticizes Butler and Matthews and asks us to "revisit this question," we are bound by our prior precedent.  See Smith v. GTE Corp., 236 F.3d 1292, 1303 (11th Cir. 2001) (rejecting "any exception to the prior panel precedent rule based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at that time").

sentence reductions.  Given these obvious credibility problems, the government's need for additional relevant evidence of Hunter's intent was significant.

Hunter's extrinsic acts involved the same drug–alpha-PVP–and, for the sales to Burris, the same intent to distribute.  As for temporal proximity, Hunter's post-arrest drug activity occurred within months to a year of her arrest.  Importantly, too, the district court cautioned the jury, both when the evidence was admitted and again in the final jury charge, that they could consider the extrinsic acts evidence only to determine whether Hunter had the requisite state of mind and had not committed the charged acts by accident or mistake.

In sum, we conclude that the district court did not abuse its discretion in admitting evidence of Hunter's post-arrest drug activity because the evidence was relevant to show her intent to commit the charged crimes and was not unduly prejudicial.

## D.    Hunter's Recorded Jail Phone Calls

The district court did not abuse its discretion in admitting recordings and transcripts of Hunter's jail phone calls under Rule 404(b).[4]  In the first disputed recording, Hunter discussed precautions she had taken in the past to avoid detection by the DEA while driving between Florida and Texas.  In the second,

---

[4]Because we conclude the recordings were properly admitted under Rule 404(b), we do not address the government's alternative argument that the recordings were inextricably intertwined with the charged drug conspiracy and thus outside the scope of Rule 404(b).

15

Hunter discussed getting "something to smoke" with "Dirt" and refused to elaborate on what Dirt had to do because she was speaking on a jail phone.

First, to the extent these two phone calls demonstrated Hunter's knowledge of and participation in prior drug deals, they were probative of her knowledge and intent to commit the charged crimes. Matthews, 431 F.3d at 1311. Second, although Hunter's statements were somewhat ambiguous, and Hunter disputed their meaning, the jury was free to disbelieve Hunter's innocent explanations for them and to find by a preponderance of the evidence that her recorded statements were in fact oblique references to her past drug activity. See Chilcote, 724 F.2d at 1502 n.2; see also Edwards, 696 F.2d at 1280. Third, the recordings were not unduly prejudicial considering their ambiguous nature and the district court's repeated limiting instructions. See Edouard, 485 F.3d at 1346.[5]

Further, any dispute as to the accuracy of one of the government's transcripts was resolved by the district court's ruling that Hunter could produce her own transcript and submit it to the jury. See United States v. Hogan, 986 F.2d 1364, 1376 (11th Cir. 1993) (explaining that the remedy for a party "skeptical of a transcript of a recorded conversation" is to prepare and submit his or her own

---

[5]Alternatively, even if the two recorded phone calls were erroneously admitted, any error was harmless given the significant amount of uninfected evidence the government presented that supports the jury's guilty verdict on Count Two. See Langford, 647 F.3d at 1323.

16

transcript and to "put on evidence supporting the accuracy of [that] version or challenging the accuracy of the other side's version").

### III.  CONCLUSION

For all these reasons, the district court did not abuse its discretion in admitting evidence of Hunter's post-arrest use and sale of alpha-PVP or the recordings of Hunter's jail phone calls in which she seemingly discussed her past drug activities.  Accordingly, we affirm Hunter's conviction.

**AFFIRMED.**